United States District Court
Middle District of Florida
Jacksonville Division

**LISA KIMBERLY RIGSBY,**

>   *Plaintiff,*

v.                                                          NO. 3:18-cv-1343-J-PDB

**COMMISSIONER OF SOCIAL SECURITY,**

>   *Defendant.*

---

# Order

Lisa Kimberly Rigsby, claiming disability beginning on November 5, 2013, brings this action under 42 U.S.C. §§ 405(g) and 1383(c) to review a final decision of the Commissioner of Social Security denying her applications for benefits.[1] Under review is a decision by an Administrative Law Judge ("ALJ") dated December 27, 2017. Tr. 10–19. Summaries of the law and the administrative record are in the ALJ's decision, Tr. 10–19, and the parties' briefs, Docs. 17, 18, and not fully repeated here.

Rigsby argues the ALJ failed to properly evaluate opinions in a "Mental Residual Functional Capacity Questionnaire" completed by her treating psychologist, Natalie Stamey, Psy.D., in December 2015.[2] Doc. 17 at 13–22.

---

[1]Rigsby filed an application for disability insurance benefits on May 25, 2015. Tr. 49. The ALJ's decision states she also filed an application for supplemental security income on November 6, 2017, Tr. 10, shortly before the hearing before the ALJ (November 28, 2017) and the ALJ's decision (December 27, 2017). The supplemental-security-income application does not appear to be in the record. The omission is immaterial to this decision, and neither side contends otherwise.

[2]Rigsby summarily states, "[The ALJ] did not make a finding regarding the opinion of [ARNP Lisa Cordell]." Doc. 17 at 17. The ALJ cited records from ARNP Cordell and stated, "Recent primary care records note various complaints but document no significant abnormal findings on examination." Tr. 16 (citing Exhibit 16F, Tr. 754–90). Rigsby does not elaborate and therefore waives any argument concerning ARNP Cordell.

A court reviews the Commissioner's factual findings for substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). That standard applies only to factual findings. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991). "The Commissioner's failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007) (quoted authority and alterations omitted).

An ALJ must evaluate every medical opinion received. 20 C.F.R. §§ 404.1527(c), 416.927(c).[3] A medical opinion is a statement from an acceptable medical source that reflects judgment about the nature and severity of an impairment, including symptoms, diagnosis, prognosis, physical restrictions, mental restrictions, and what someone can do despite the impairment. 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1).

An ALJ must state with particularity the weight she gives a medical opinion and the reasons for that weight. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). Factors to decide the weight include the examining relationship, the treatment relationship, supportability, consistency, and specialization. 20 C.F.R. §§ 404.1527(c), 416.927(c).

An ALJ generally will give more weight to the medical opinions of treating sources because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). But an ALJ need not give more weight to a

---

[3]For claims filed before March 27, 2017, the rules in 20 C.F.R. §§ 404.1527 and 416.927 apply. Because Rigsby filed her claims for benefits before March 27, 2017, those rules apply here.

2

treating source's medical opinion if there is good cause to do otherwise and substantial evidence supports the good cause. *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004). Good cause exists if the evidence does not bolster the opinion, the evidence supports a contrary finding, or the opinion is conclusory or inconsistent with the treating source's own medical records. *Id.* at 1240−41.

In Dr. Stamey's "Mental Residual Functional Capacity Questionnaire," she explained she had performed a psychological evaluation of Rigsby on April 16, 2015, and Rigsby attended fourteen additional sessions between April and October 2015. Tr. 750. For a "DSM-IV Multiaxial Evaluation," she wrote "Axis I: F44.5 Conversion D/O with Attacks or Seizures"; "Axis II: none"; "Axis III: see medical record"; "Axis IV: finances, health, housing, conflicting relationship with husband and in[-]laws"; and "Axis V: Current [Global Assessment of Functioning ('GAF') rating]: 45." Tr. 750. She wrote that Rigsby's highest GAF rating in the last year was 50. Tr. 750. She drew an arrow pointing to "husband and in[-]laws" and wrote, "primary problem." Tr. 750.

Under "Identify your patient's signs and symptoms," Dr. Stamey checked anhedonia or pervasive loss of interest in almost all activities; decreased energy; feelings of guilt or worthlessness; impairment in impulse control; mood disturbance; difficulty thinking or concentrating; recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress; persistent disturbances of mood or affect; persistent, nonorganic disturbance of vision, speech, hearing, use of a limb, movement and its control, or sensation; apprehensive expectation; intense and unstable interpersonal relationships and impulsive and damaging behavior; disorientation to time and place; motor tension; emotional lability; flight of ideas; deeply ingrained, maladaptive patterns of behavior; pressures of speech; easy distractibility; incoherence (adding, "with attacks only"); emotional withdrawal or isolation; autonomic hyperactivity; memory impairment—short, intermediate, or long term; and sleep disturbance. Tr. 750–51.

The form directs the provider to explain the patient's ability "to do work-related activities on a day-to-day basis in a regular work setting" on a scale of 1 to 5.

3

Tr. 751. A rating of 4 means the person can "perform designated task or function, but has or will have noticeable difficulty (distracted from job activity) more than 20 [percent] of the workday or workweek (i.e. more than one hour and up to two hours per day <u>or</u> more than one half day to one day per week)." Tr. 751 (emphasis in original). A rating of 5 means the person cannot "perform the designated task or function on a regular, reliable and sustained basis." Tr. 751.

Under "Mental Abilities and Aptitudes Needed to do Unskilled Work," Dr. Stamey checked "5" for Rigsby's ability to remember work-like procedures; understand and remember very short and simple instructions; carry out very short and simple instructions; maintain attention for a two-hour segment; maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; deal with normal work stress; and be aware of normal hazards and take appropriate precautions. Tr. 752.

Under "Mental Abilities and Aptitudes Needed to do Semiskilled and Skilled Work," Dr. Stamey checked "5" for Rigsby's ability to understand and remember detailed instructions, carry out detailed instructions, set realistic goals or make plans independently of others, and deal with the stress of semiskilled and skilled work. Tr. 752.

Under "Mental Abilities and Aptitude Needed to do Particular Types of Jobs," Dr. Stamey checked "4" for Rigsby's ability to interact appropriately with the general public, maintain socially appropriate behavior, and adhere to basic standards of

4

neatness and cleanliness. Tr. 752. Dr. Stamey checked "5" for Rigsby's ability to travel in unfamiliar places and use public transportation. Tr. 752.

Under "Has your patient's impairment lasted or can it be expected to last at least twelve months," Dr. Stamey checked, "Yes." Tr. 753. Next to "Is your patient a malingerer," she checked, "No." Tr. 753. Next to, "Are your patient's impairments reasonably consistent with the symptoms and functional limitations described in this evaluation," she checked, "Yes." Tr. 753. Under, "Please describe any additional reasons not covered above why your patient would have difficulty working at a regular job on a sustained basis," she wrote, "Patient has frequent attacks/episodes that prevent functioning. See explanation below." Tr. 753. Under, "Can your patient manage benefits in his or her own best interest," she checked, "Yes." Tr. 753.

At the bottom of the form, Dr. Stamey handwrote:

> Lisa Rigsby's biggest stressor is her husband. Stress is manifested in Lisa in terms of symptoms which appear to be neurological in nature[] but are not. They are caused by stress/husband. These episodes present suddenly [and] incapacitate her. She shakes [and] has convulsions which are severe in nature. Sometimes she has the episodes all day long, sometimes more than 10 per day. She is not able to speak during these episodes or recall what has happened. She is literally terrorized by fear of him. This fear, anxiety [and] anger all create physical symptoms in her that she has <u>no</u> control over. The only treatment for this disorder is reducing the stress (husband), antidepressants, and therapy (which she cannot afford). Her prognosis is poor without these three components. She cannot work at all until these episodes go away.

Tr. 753 (emphasis added).

At an administrative hearing, Rigsby's lawyer asked her whether having been divorced from her husband for two-and-a-half years has affected her symptoms, and she responded she has experienced no improvement, with no change in the number of seizures she is having. Tr. 36. The ALJ asked the vocational expert if breaks taken at different times and for different durations would be tolerated in the representative jobs the vocational expert identified, and the vocational expert testified no, explaining only customary breaks (15 minutes in the morning, a 30-minute lunch, and 15

minutes in the afternoon) and additional 10-percent of "off-task" behavior would be tolerated. Tr. 45. The ALJ asked the vocational expert, "And absenteeism. Some days are better than others and you need to leave early, or come in late, or call off altogether once a week. Is that too much?" Tr. 45. The vocational expert responded, "That is too much," explaining, "Many employers allow 10 unscheduled absences per year." Tr. 45.

In the decision, the ALJ found Rigsby has severe impairments of "pseudoseizure disorder; headaches; bipolar disorder; gastrointestinal disorders diagnosed as history of microscopic colitis, irritable bowel syndrome ('IBS'), ulcerative colitis, and gastritis; and degenerative disc disease ('DDD') of the cervical spine." Tr. 12.

The ALJ did not expressly consider Listing 12.07 concerning somatoform disorders but found Rigsby has only moderate limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. Tr. 13. The ALJ explained:

> The claimant is able to read, shop, cook, clean, attend to her personal needs, handle finances, take her medications, attend appointments, interact with medical personnel and her family, etc., despite her allegations of episodes and impaired memory, suggesting no more than moderate limitations of functioning in th[ese] domain[s].

Tr. 13.

The ALJ found Rigsby has the residual functional capacity ("RFC") to perform work at all exertional levels with limitations: no climbing, exposure to hazards, or exposure to concentrated temperature extremes; only simple, routine tasks that require no exposure to the public to prevent unknown variables; and a work environment with only occasional changes. Tr. 14.

The ALJ summarized Rigsby's allegations:

> The claimant alleges disability due to gastrointestinal issues that cause abdominal pain and daily vomiting as well as twenty to thirty pseudo-seizures per week. She testified that she cannot work because she is not reliable given her inability to drive, daily vomiting and unpredictable pseudo-seizures as well as memory loss. She testified that none of her treating providers have given her lifting restrictions and she is able to help with household chores, prepare simple meals and frozen dinners, though she testified that she "basically lives on baby food, Jell-O, and bananas." She lives with her mother and stepfather, moving in with them after her divorce. She no longer drives so she sold her car to pay for medical expenses. She frequents a psychiatrist and doctors' offices for follow-up evaluations and medication refills. She takes anti-depressants but is no longer able to afford therapy even though she stated that it helped her.

Tr. 15.

> The ALJ then stated:

> The claimant's testimony and allegations are similar to those reported in function and pain reports, though she also alleges chronic headaches and diarrhea in those reports. She also reported a higher functioning level as well, including an ability to care for her dogs, attend to household chores, shop for groceries, handle finances, read, get her hair done monthly, go to appointments, etc. She reported that her seizures cause unconsciousness for 15-20 minutes and an inability to talk, that she does not know where she is for 30 minutes and that her equilibrium is off for 1-2 days after a seizure. (Exhibits 4E–6E, 10E–11E)[.]

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce some of the above alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. Accordingly, these statements have been found to affect the claimant's ability to work only to the extent they can reasonably be accepted as consistent with the objective medical and other evidence.

Tr. 15.

The ALJ summarized some of the medical evidence. Tr. 15–17. Concerning medical evidence of Rigsby's pseudoseizures and other mental impairments, the ALJ stated:

> The claimant has treated for pseudoseizures since at least December 2013. Records note that she was completely normal after her 15[-]second episode that occurred during a hospital visit. (Exhibit 2F)[.] Records note that she had no postictal state. (Exhibit 4F)[.] Testing confirmed her seizures were not epileptic in nature. (Exhibits 4F, 6F, 7F)[.] She was advised to avoid driving, avoid heights, and avoid swimming alone. (Exhibit 8F)[.]
>
> Recent primary care records note various complaints but document no significant abnormal findings on examination. (Exhibit 16F)[.]
>
> The claimant has also treated for bipolar disorder since at least 2004 and did well with medications. Her symptoms have waxed and waned, but her GAF scores have been consistently high, even during periods of increased situational/familial/mar[it]al stress. She has been treated with medications and counseling and has had no significant mental status abnormalities. Of note, these records indicate the claimant stopped working because her husband worked and took care of the finances, not because of any limitations from her impairments. These records note that her pseudoseizures or conversion disorder is caused by stress and can be controlled. (Exhibits 3F, 7F, 9F, 14F, 18F)[.]

Tr. 16.

The ALJ did not discuss a report of EEG monitoring done at Mayo Clinic from March 16 to March 18, 2015.[4] *See generally* Tr. 15–17. The report explains Rigsby had "[t]hree clinical episodes of unresponsiveness, nonstereotyped motoric shaking, and amnesia which were not associated with any electrographic seizure correlate." Tr. 639. The report provides:

> Over the course of monitoring, the patient had 3 of her habitual events. The patient reported that these events felt like her usual events that she has at home. The clinical characteristics of these events consist of asymmetric and asynchronous limb movements which are nonstereotyped from event to event. There is stop and start movement of the limbs. A couple of these events also had associated head shaking movements from side to side. Back arching was a feature of one of the

---

[4]The ALJ did cite some language from the discharge plan, which included directions to avoid driving, heights, and swimming. Tr. 16 (citing Exhibit 8F [Tr. 631]). Notes from the discharge plan also stated, "Patient is stable for discharge home"; "Medications as per discharge medication summary"; "Resume regular diet"; "Activities as tolerated"; "Follow up with outpatient neuropsychology and psychiatry." Tr. 631.

8

events. She also had postictal sobbing associated with these episodes. She is unresponsive during these events, which can last up to 3 minutes. Blood pressure and heart rate tend to increase slightly[.] Concomitant EEG during these episodes does not reveal any electrographic seizure activity. When eyes are temporarily closed, her usual background beta activity can be seen. Review of inerictal data and spike detection files did not reveal any pathologic epileptiform discharges.

Tr. 638–39.

Notes of Jerry Shih, M.D., in a related "Epilepsy Monitoring Unit Discharge Summary" explain:

This study captures 3 of this patient's habitual events. The diagnosis is nonepileptic events (NEE; also termed pseudoseizure, psychogenic seizure, nonepileptic seizure, psychogenic nonepileptic attacks) …. We discussed the common risk factors …, including chronic pain, nonrestorative sleep, intercurrent medical comorbidities, as well as untreated or undertreated mood or anxiety issues. I emphasized the fact that NEE is oftentimes an involuntary physical manifestation of overwhelming underlying physical, emotional, and psychological stress. We discussed the treatment plan is directed at optimizing treatment of any of the risk factors, as well as the institution of cognitive behavioral therapy (CBT).

Tr. 631.

Addressing Dr. Stamey's opinions, the ALJ stated:

The claimant's psychologist, Natalie Stamey, completed a mental [RFC] questionnaire noting the claimant has conversion disorder with attacks or seizures. She notes a plethora of symptoms (see pages 1 and 2) and opined that the claimant does not have the mental abilities and aptitudes needed to do even unskilled work. She notes the claimant cannot work until her episodes cease. (Exhibit 15F)[.]

Because the claimant has consistent complaints of seizure[-]like activity/episodes and complaints of memory loss, she has been limited to simple, routine tasks with no exposure to the public so there are no unknown variables in her day and no more than occasional changes in the work environment. This, along with the hazard precautions due to her episodes [no climbing or exposure to hazards or concentrated temperature extremes], account for her mental impairments. Though Psychologist Stamey opined the claimant is unable to work because of her symptoms, this is not supported by the totality of the evidence noting

9

good ability to function, good response to medication and counseling, and consistently high GAF scores. Therefore, Dr. Stamey's opinions are given **no weight** in favor of the totality of the objective evidence, which notes essentially no abnormal mental status findings.

Tr. 16 (emphasis added).

Rigsby shows reversible error. The ALJ failed to adequately explain why she was giving "no weight" to Dr. Stamey's opinions while at the same time accepting that Rigsby has pseudoseizure disorder and resulting seizure-like episodes and memory loss. Dr. Stamey opined Rigsby is not a malingerer; her episodes present suddenly; her episodes incapacitate her; and fear, anxiety, and anger combine to create the physical symptoms over which she has no control. Tr. 753. And both Dr. Stamey and Dr. Shih opined treatment for the disorder includes not only addressing stress factors but also undergoing therapy. Tr. 631, 753. The ALJ appears to have rejected none of those opinions yet also appears to have determined Rigsby's RFC based on an unexplained assumption that minimizing only workplace stress will minimize or eliminate the episodes. *See* Tr. 14 (finding RFC that includes limitations to simple, routine tasks that require no exposure to the public to prevent unknown variables and a work environment with only occasional changes). The reasons for rejecting Dr. Stamey's opinions appear to relate only to Rigsby's bipolar disorder and mental impairments generally. The error is not harmless considering testimony of the vocational expert that breaks taken at different times and for different durations—presumably what the episodes would require—would not be tolerated in the representative jobs the vocational expert identified. Tr. 45.

Thus, the Court:

(1) **vacates** the Commissioner's decision;

(2) **remands** for further consideration of the medical opinions, including those in the "Mental Residual Functional Capacity Questionnaire" completed by treating psychologist Natalie Stamey, Psy.D., in December 2015, and to take any further necessary action; and

(3) **directs** the clerk to enter judgment under sentence four of 42 U.S.C. §§ 405(g) and 1383(c) (incorporating § 405(g)) in favor of Lisa Kimberly Rigsby and against the Commissioner of Social Security and close the file.

**Ordered** in Jacksonville, Florida, on March 23, 2020.

　　　　　　　　　　　　　　　　　　　　　
Patricia D. Barksdale
*United States Magistrate Judge*

c:　　Counsel of record